HANNAH HIRSCHMANN AND ANDREW G. JOHNSTON v. THE IRON RANGE & HURON BAY RAILROAD COMPANY.

*Principal and agent—Scope of authority—Estoppel—Evidence.*

1. Plaintiffs sued to recover for supplies furnished to parties engaged in the construction of defendant's road, upon the claim that the goods were delivered upon orders given by defendant's agent, and upon its credit. And it is held that the question of the authority conferred upon the alleged agent was one of fact for the jury, and that the testimony brings the case within any one of the following rules:

    *a*—If defendant relinquished to another (to whom it had let a contract for building its road, and who was the promoter and organizer of the scheme) the matter of the construction of the road, and he knew that the alleged agent (who was the engineer in charge of the work, which was being performed by a subcontractor) was contracting the obligations sued upon in defendant's name and upon its credit, he must be deemed to have adopted them, and his knowledge was the knowledge of the defendant, and it is liable on said obligations.

    *b*—If defendant's officers were advised that said agent had incurred certain indebtedness to plaintiffs in the name and upon the credit of defendant, and made no protest, but, on the contrary, corresponded directly with plaintiffs, and paid them that indebtedness, plaintiffs were justified in relying upon such action as an assurance of the authority of the agent, and

in extending further credit, and defendant is estopped from denying such authority.

c—If the agent, in the exercise of the authority given to him by the subcontract to declare it forfeited in case of the inability of the subcontractor to perform it, was prosecuting the work for and on behalf of the defendant, which had assumed its performance, and incurred the indebtedness to plaintiffs in such prosecution, plaintiffs are entitled to recover.

d—If the agent was entering into contracts for work upon the road, employing men and purchasing supplies in the name of the defendant and upon its credit, and its officers knew of this fact, or had been advised of instances of like conduct, and remained silent, the defendant cannot now be heard to say that the agent was acting without authority, even though the same had been originally limited by secret instructions.[1]

2. The following propositions are summarized from the opinion of Mr. Justice McGRATH:

a—If an agent of a corporation is allowed to exercise general authority in respect to its business, or a particular branch thereof, for a considerable time, or, in other words, if he is held out to the world as having authority in the premises, the corporation is bound by his acts in the same manner as if the authority were expressly granted; citing 17 Amer. & Eng. Enc. Law, 135.

b—The declarations of an agent are not admissible to prove an agency, but where there is testimony to show ratification, or original authority, or a holding out to the world as having authority, such declarations accompanying the act are admissible to show in what capacity he contracted; citing Campbell v. Sherman, 49 Mich. 534; Haughton v. Maurer, 55 Id. 323; Bacon v. Johnson, 56 Id. 182.

Error to Marquette. (Stone, J.) Argued June 21, 1893. Decided November 10, 1893.

Assumpsit. Defendant brings error. Affirmed. The facts are stated in the opinion.

Wells, Angell, Boynton & McMillan (Ashley Pond, of counsel), for appellant, contended:

---

[1] See Manufacturing Co. v. Brown, 96 Mich. 213, as to secret instructions.

1. It cannot be contended that a chief engineer of a railroad company, by virtue of his position, has authority to pledge the credit of his principal for goods furnished to a contractor or his subcontractors in the construction of the railroad; citing *Campbell v. Railway Co.*, 6 S. W. Rep. 337; *Gardner v. Railroad Co.*, 70 Me. 181; *Thayer v. Railroad Co.*, 24 Vt. 440; *Vanderwerker v. Railroad Co.*, 27 Id. 130; *Powrie v. Railway Co.*, 1 Colo. 529.

2. The statements of an agent are no proof of his authority, or of its extent; citing *Hatch v. Squires*, 11 Mich. 185; *Kornemann v. Monaghan*, 24 Id. 36; *Reynolds v. Insurance Co.*, 36 Id. 131; *Rice v. Peninsular Club*, 52 Id. 87; *Bond v. Railroad Co.*, 62 Id. 643; *National Bank v. Gilchrist*, 83 Id. 253; *Swanstrom v. Improvement Co.*, 91 Id. 367; Mechem, Ag. §§ 100–102, and cases cited; and for a full discussion of the doctrine of *res gestœ* as applied to agents, see Mechem, Ag. §§ 714–716.

3. The individual directors of a corporation have no authority to bind the corporation by virtue of their position. When they act, they act as a body, and individual action, in the absence of authority from the corporation, is of no effect; citing *Lockwood v. Boom Co.*, 42 Mich. 536; Rorer, Railroads, 224; Mor. Priv. Corp. § 531.

4. Even if defendant were guilty of negligence in that it failed to keep itself informed of the acts which Davis was doing, if, as claimed by the plaintiffs, he did the acts testified to in this case, yet the plaintiffs were guilty of contributory negligence; citing Whart. Ag. § 137; Mechem, Ag. §§ 289, 290; *Iron Mine v. Bank*, 39 Mich. 644; *Hurley v. Watson*, 68 Id. 531; *Bond v. Railroad Co.*, 62 Id. 643; *Lumber Co. v. Williams*, 73 Id. 86.

5. To prove agency by the principal's ratification of an act of an agent, it must appear that he had knowledge of all the material facts, and, in case of an implied ratification, the facts and circumstances from which it may be inferred must be such as are inconsistent with a different intention; citing *Heyn v. O'Hagen*, 60 Mich. 150; *Hovey v. Brown*, 59 N. H. 114; *Zoebisch v. Rauch*, 133 Penn. St. 532.

*E. E. Osborn*, for plaintiffs.

McGRATH, J.  Plaintiffs sue to recover for supplies furnished to parties engaged in the construction of defendant's road, upon the claim that the goods were supplied upon orders given by an alleged agent of the company, one

Milo Davis, and upon the company's credit. The plaintiffs had judgment, and defendant appeals.

The principal question arises as to the authority of the agent to bind the company. The defendant company was organized June 30, 1890. The capital stock was fixed at $500,000. But $25,000 of the stock was subscribed at the date of the incorporation. Of this amount C. H. Buhl took $10,000, and his son $6,000. Henry Stephens became interested, and C. H. Buhl was elected president, Henry Stephens vice-president, T. D. Buhl treasurer, and F. L. Dodge secretary. James M. Turner was the promoter and organizer of the scheme. On July 26, 1890, an agreement was entered into between the company and Turner, by the terms of which Turner was to build and complete the road, and receive therefor $705,000 in first mortgage bonds, and the further sum of $705,000 in common stock. On the same date the following agreement was entered into between Turner, Buhl, and Stephens:

"Memorandum of an agreement made and entered into this 26th day of July, A. D. 1890, between Christian H. Buhl and Henry Stephens, of Detroit, Michigan, and James M. Turner, of Lansing, Michigan, witnesseth:

"*First.* The parties hereto hereby associate themselves together for the purpose of constructing, owning, and operating a railroad from Huron Bay, on Lake Superior, to Champion, Michigamme, and Republic, in the counties of Baraga and Marquette, in said State of Michigan; also for acquiring all necessary water frontage on Huron Bay, and the construction of proper ore docks at the northern terminus of said road on Huron Bay. For the purpose of carrying out the project above mentioned the parties hereto are to promote the organization of the Iron Range & Huron Bay Railroad Company, articles of association for which have already been filed.

. "*Second.* It is understood and agreed between the parties hereto that the railroad, when properly constructed, is to be sold to the best possible advantage within three years from the date of its completion, unless otherwise agreed between the parties hereto; it being understood and agreed that when so sold it shall be sold as an entirety, and that none of the parties to this agreement will part with his interest in the road without the full knowledge and consent of the other parties to this agreement, it being understood

that the property will have much greater value as an entirety than to be held in small interests.

"*Third.* After the proper organization of said Iron Range & Huron Bay Railroad Company, it is hereby understood and agreed that the contract for the construction of said railroad, station houses, ore docks, and other necessary appurtenances and equipment shall be let to James M. Turner, one of the parties hereto, he to receive, in consideration of such construction, all the stock and bonds of said railroad company; it being, however, understood and agreed that, although said contract for construction will be made with James M. Turner, all the parties to this agreement are equally interested in said contract, and that said contract will be entered into for the joint benefit and interest of the parties hereto, and that the said Turner, in taking said contract, is acting as much for and in the interest of said Christian H. Buhl and Henry Stephens as for the interest of himself.

"*Fourth.* For the purpose of executing the contract providing for the construction of said railroad, the said Turner is to contribute, without charge, his time in connection with acquiring all necessary right of way and water front; and the said Buhl and the said Stephens hereby agree to furnish the necessary money, share and share alike, for the purpose of carrying out the project for the construction of said road, necessary ore docks, equipment, and other appurtenances, the said Turner to give to the said Buhl and the said Stephens his promissory notes, drawing 7 per cent. interest, for his one-third of the cost of carrying out said construction contract, all the stock and bonds to which the said Turner would be entitled for his one-third share in said construction contract to remain with and be the property of said Christian H. Buhl and the said Henry Stephens until said notes are paid; the said Turner to have the right at any time to pay up his one-third of the cost of construction of said road, and receive therefor his one-third share of all the stocks and bonds to which he would be entitled under this agreement, together with the aforesaid notes; it being understood, however, that the interest of said Turner is to be carried equally by the said Christian H. Buhl and the said Henry Stephens until the said railroad is disposed of, as may hereafter be mutually agreed upon between the parties hereto.

"*Fifth.* It is hereby understood and agreed on the part of said Turner that in the execution of the construction contract, and the providing for all necessary equipment, right of way, station buildings, ore docks, the acquirement of necessary lands and water fronts, in order to carry out the construction contract, which it is hereby provided shall be entered into between the Iron Range & Huron Bay Railroad Company and the said Turner, he, the said Turner, is to be governed by the mutual understandings and agree-

ments between the parties hereto, and that no indebtedness shall be incurred, and no expenditures made, without the full consent and co-operation of all the parties to this agreement; said agreement having been entered into for the mutual advantage of all the parties thereto.

"In witness whereof the said parties hereto have hereunto set their hands and seals this 26th day of July, A. D. 1890.

"C. H. BUHL.          [L. S.]
"HENRY STEPHENS.   [L. S.]
"JAMES M. TURNER.  [L. S.]"

On the 16th of August, 1890, an agreement was entered into "between Wallace Dingman, of the first part, and James M. Turner, for the Iron Range & Huron Bay Railroad Company, of the second part," by the terms of which Dingman was to complete the road ready for the iron, at prices stated, on or before August 1, 1891. The work was to be done under the supervision of a "chief engineer." In consideration of the premises, James M. Turner was to pay the prices named. This agreement was executed by Wallace Dingman and James M. Turner. Under it Dingman commenced operations. On November 15, 1890, the prices for certain work were advanced by a short supplemental agreement signed "W. Dingman," and then occurs this clause:

"We, the undersigned, agree to the above, provided J. M. Turner coincides and agrees with us.

"C. H. BUHL.
"HENRY STEPHENS.

"D. R. PEIRCE, Witness."

Then follows the approval of James M. Turner, dated December 1, 1890.

Dingman continued the work, and was paid the regular monthly estimates by the company until the May, 1891, estimate, when the company seems to have undertaken the distribution of the amount of the estimates. In the latter part of August, 1891, Dingman abandoned the contract.

Turner says he was but nominally the contractor. Mr. Buhl says that Turner was considered as a man of large

means and credit. ".He was the originator of the scheme, and we went in with him. We left the matter with him from the very first, and he failed to perform his part. We tried to have him continue the exercise of these powers, but he wouldn't do it. We wanted his services, but he failed to do as he agreed."

Two letters written by Mr. Buhl to Mr. Turner are submitted,—one dated November 17, 1890, in which the writer says:

"Mr. T. H. Hamilton, of Toledo, called upon me to-day with bids for ore dock at Huron Bay. Have had some conversation with him in relation to the dock. I find Mr. Davis asked bids for a dock about 50 per cent. longer than we talked about, as I remember.    *    *    *    *    *
"Mr. Peirce, I suppose, has written you we had Mr. Dingman here, ready to throw up his job unless we increase pay upon· ties and part of the gradings. Mr. Stephens came down. We thought best to do so. Tried to reach you by telegram, but failed to do so."

The other is dated January 14, 1891, and says:

"Your letter of yesterday reached me. I would like a conference meeting between us,—you and Mr. Stephens.    * * If Mr. Davis could come down and meet with us, would like to have him do so. No new ore docks will be wanted this year, so no haste in pushing very fast. Please fix time through Mr. D. R. Peirce."

Turner met with the directors from time to time, and unquestionably, upon this record, had general authority respecting the construction of this road. Milo Davis was the chief engineer. Turner employed him, and gave him general authority. He says: "I gave the orders to Mr. Davis from time to time,—pretty much entirely the first 12 months. He was our resident man in that locality." Davis was doing the preliminary work, and had some 30 men under his own immediate charge. Davis was examined as a witness for defendant. He says that he did not get his authority from Mr. Turner entirely; that Turner sent him

up there to build the road; that his authority was not limited by either Turner or the company; that he had authority "to buy goods to prosecute my work,—that is, the company's work,—anywhere I pleased;" and that he bought supplies from Mr. Smith as early as May 13. The company had an office at Arvon, and one Clark was its book-keeper there. Clark was under the immediate supervision of Davis.

Plaintiffs testify that in May, 1891, Davis came to them, and directed them to furnish supplies to certain parties, to keep accounts with these parties, to charge the supplies to the company, and to send the bills to the company's office; that in June they furnished to the various parties named by Davis bills of goods aggregating in value $5,734; that in July they received the company's check for $1,000, and later in July a check from the company for $4,734, in payment of the bills; that after these payments they furnished the goods for the value of which this suit is brought. The company sought to show that these goods were furnished to Dingman and his subcontractors, and that the credit was given to Dingman; but there is no testimony which can be fairly said to tend to show that the goods were furnished on Dingman's credit. Plaintiffs positively deny any dealings with Dingman, or any conversation with him respecting the matter. Several of the parties to whom the goods were furnished testify that they were directed by Davis to get the goods from plaintiffs, and they deny that any credit was asked for by them or given them by plaintiffs. One of the items sued for is goods furnished Archibald Campbell, aggregating in value $3,686.98. Campbell testifies that he was at the time engaged in building two miles of defendant's road under a contract with the company entered into by Davis. This witness produced a statement of account furnished him by J. M. Clark, the company's book-keeper, having this caption: "A. Campbell,

in account with I. R. & H. B. R. R. Co." In this account, aggregating $9,575.62 of like debits, the witness is charged with two items of goods furnished by plaintiffs,—one of $300, and one of $696.72. Other witnesses were sworn who had procured goods from plaintiffs by direction of Davis, and who testified that they were employed by Davis directly, and had no contract with Dingman.

It was shown that Davis had ordered goods from one J. B. Smith, and that the company afterwards paid an account to J. B. Smith for supplies, amounting to $832.30. The defendant claims that Davis was specially authorized to buy supplies from Smith for the railroad, July 10, 1891; but Davis testifies that he bought supplies from Smith in May, and Smith says he sent a bill every month to the company at Arvon. However that may be, the transaction bears upon the scope and range of Davis' employment and duties. The authority to purchase tools and supplies generally tended to show power to use and employ them.

Mr. Turner says that about the middle of July he was present at a meeting in Detroit. He thinks the directors were present. "Mr. Buhl, Mr. Stephens, Milo Davis, and I were present." Mr. Davis reported the amounts due to various parties. On that occasion this particular account was discussed, and Turner desired to pay but a portion of it, but Davis then said that the goods had been ordered by him, and in order to be able to continue to get supplies the account must be paid, and it was arranged to pay $1,000 of the amount then, and to send the balance later in the month. Other accounts were spoken of by Davis in the same way. Mr. Buhl then said that, if that was true, the accounts must be paid.

Plaintiffs received the first check of $1,000 at the hands of Davis. They objected, saying that the payment was insufficient on an account so large as theirs. They afterwards manifested some uneasiness about their account, and

wrote to the company. On July 29, 1891, "D. R. Peirce, for I. R. & H. B. R. R. Co.," telegraphed to plaintiffs as follows: "Remittance to you and Mrs. Muck tomorrow; see letter." On July 31, 1891, Peirce again telegraphed to plaintiffs as follows: "See Milo Davis, who will pay June account." Upon receipt of this telegram, Mr. Johnston, one of the plaintiffs, and Muck, another creditor, went together to Arvon and saw Davis, who gave Johnston the check for $4,734. "Davis then said, 'Now, Mr. Johnston, you are satisfied that the company has accepted your account?' I told him yes; if they paid me, of course I was satisfied. He says, 'We can have some more goods?' I says, 'Yes, sir; you can.'" Johnston says further:

"I went to Detroit about September 1, and saw Mr. Buhl. I asked Mr. Buhl about our account, and he said he didn't know in what shape matters were up there; they were having some trouble to find out. In reply to my inquiry he said: 'Mr. Johnston, we had a man up there, —our agent, Mr. Milo Davis,—a man I had perfect confidence in; but I think he had too much work.' I told Mr. Buhl that Mr. Davis had ordered these goods as their agent. He said that he may have overstepped his authority."

It appeared that Davis, in the course of his correspondence with Mr. Turner, with Mr. Buhl, and generally, used a letter-head which was as follows:

"IRON RANGE & HURON BAY RAILROAD COMPANY.
"Milo Davis, Chief Engineer and Superintendent of Construction."

Mr. Buhl says he did not notice this heading. Mr. Turner says that he had noticed it, and made no objections. Mr. Turner practically concedes that the letter-head was entirely proper, and says that Mr. Davis was the resident factotum of the company. He testifies that he knew that Davis was buying these supplies from plaintiffs, and others, in the company's name and upon the company's credit.

There was testimony showing that to several parties Davis had, as early as May, represented that Dingman was unable

to complete the contract entered into by him; that he was financially ruined, and that the work was being prosecuted by the company in Dingman's name; and the testimony of Davis, as well as the conduct of the company, tends to corroborate the statements as alleged to have been made.

With the June estimate, which aggregated $84,543.04, a statement of amounts due various parties, aggregating over $50,000, was presented at the company's office. This statement was O. K.'d by Dingman; but the testimony tended to show that Dingman knew very little, if anything, about these items or the existing indebtedness, and that Davis knew all about them. In this account there is an item of $250 "paid W. Dingman." Of this entire estimate of $84,543.04, the amount $250 appears to be the only sum that went into or through Dingman's hands.

In view of this record, the question of the authority conferred upon Davis was clearly one of fact for the jury. It is idle to say that Turner's authority was that of a mere contractor, or that his action was subject to the supervision of a creature of his own selection. The purpose of the contract entered into between the company and Turner was plainly apparent when the contemporaneous agreement between Turner, Buhl, and Stephens, and the subsequent action, are considered. The form and execution of the Dingman contract indicates the capacity in which Turner was acting, and the extent of his powers. He was to act as medium, rather than contractor. The delegation of power to him was express. He was expected to supervise and direct the construction of the road, and his authority was commensurate with that expectation. There was, in fact, a relinquishment to him of the management of that business. He was not expected to be and remain at the base of operations. The testimony tended to show that Davis was employed by Turner as the resident factotum of the company; that his authority was not confined to the

mere supervision of the Dingman contract; that during the months of May, June, and July he was openly and notoriously purchasing supplies, employing men, and letting contracts in the name of the company; that the contract with Dingman had expressly conferred upon him the power to declare the contract forfeited, and that he had exercised that authority, and had announced Dingman's inability to continue, and the assumption by the company of the work; that in June and July the money to pay the laborers along the line of the road was disbursed by him; that at the office of the company, and in consultation with the officers of the company, he had directed to whom the moneys upon the estimates for June and July should be paid; that Turner knew that Davis was contracting obligations, and the particular obligation in question, in the company's name and upon its credit; and that the officers and directors of the company were also aware of this conduct, and ratified it by payment of the plaintiffs' bill for June, amounting to $5,734, and that the bill was paid because Davis informed the officers of the company that he had contracted it, and that unless paid he would be unable to get further supplies. This testimony brings the case within any one of several well-established rules:

1. If the company relinquished to Turner the matter of the construction of this road, and Turner knew that Davis was contracting these obligations in the name and upon the credit of the company, Turner must be deemed to have adopted them. His knowledge was the company's knowledge, and the company is liable.

2. If the officers of the company were advised that Davis had incurred the June indebtedness to plaintiffs in the name and upon the credit of the company, and with that knowledge did not protest, but, on the contrary, corresponded directly with the plaintiffs, and paid that account, plaintiffs were justified in relying upon that action as an assurance of Davis' authority, and extending further credit, and defendant is estopped from denying the authority of Davis.

3. If Davis, in the exercise of the authority given to him by the contract, in view of Dingman's inability, was prosecuting the work for and on behalf of the company, and incurred this indebtedness in such prosecution of the work, the plaintiffs were entitled to recover.

4. If Davis was entering into contracts for the work upon the road, employing men and purchasing supplies in the name of the company and upon its credit, and the officers of the company knew of the fact, or had been advised of instances of like conduct, and remained silent, the company cannot now be heard to say that such person so acting was without authority.

Davis was sent, as the agent of the company, into the locality where the company was operating, and, even though his authority was limited by secret instructions, if he assumed authority to make purchases and enter into contracts relating to the operations of the company, and the company suffered him to do so, especially if it had actual notice of acts on his part similar in character to that in dispute, and acquiesced, it cannot now be allowed to insist upon his want of authority. It is well settled that if an agent of a corporation is allowed to exercise general authority in respect to the business of the corporation, or a particular branch of it, for a considerable time, —in other words, if he is held out to the world as having authority in the premises,—the corporation is bound by his acts in the same manner as if the authority were expressly granted. 17 Amer. & Eng. Enc. Law, 135. The corporation must be deemed to have clothed the agent with authority to do what it has permitted him openly and notoriously to do without rebuke. As is said in *Olcott v. Railroad Co.*, 27 N. Y. 546, 558:

"The powers of an agent of a corporation are such as he is allowed by the directors or managers of the corporation to exercise; and the silent acquiescence of the directors or managers may be as effectual to clothe the agent with power as an express letter of attorney." *Melledge v. Iron Co.*, 5 Cush. 158; *Bank v. Dandridge*, 12 Wheat. 64;

*Perkins v. Insurance Co.*, 4 Cow. 645; *Bridenbecker v. Lowell*, 32 Barb. 9.

In the last case cited, the court say:

" A general agency is therefore constituted, not by the authority which the agent actually receives from his principal, but by that which the latter allows the agent to assume." *Ceeder v. Lumber Co.*, 86 Mich. 541.

The base of the company's operations was in the northern part of the State, distant from the general offices of the company. Davis was the sole representative of the company in that locality. He held himself out as chief engineer and superintendent of construction. In *Whitaker v. Kilroy*, 70 Mich. 635, 638, Mr. Justice CAMPBELL says:

" We think that persons dealing with such a corporation for work have a right to get their information from the person whom the corporation has put in charge, and cannot be required to go elsewhere; and that contracts so made are valid contracts when relating to the ordinary concerns of such business. And if persons are not sustained in contracting with such superintendents they can never be safe. They have no means of knowledge except inquiry somewhere, and the person put by the corporation in open charge of the business must have power, as to third persons, to represent it."

Plaintiffs were entitled to show what powers had been assumed by Davis, and the extent to which he had been contracting in the name of the company, and any instances in which such conduct had been brought home to the knowledge of the company or its officers. *Olcott v. Railroad Co., supra; Beattie v. Railroad Co.*, 90 N. Y. 643.

The declarations of an agent are not admissible to prove an agency, but when there is testimony to show ratification, or original authority, or a holding out to the world as having authority, such declarations accompanying the act are admissible to show in what capacity he contracted. *Campbell v. Sherman*, 49 Mich. 534, 536; *Haughton v. Maurer*, 55 Id. 323; *Bacon v. Johnson*, 56 Id. 182.

We find no error in the record, and the judgment is affirmed.

LONG, GRANT, and MONTGOMERY, JJ., concurred. HOOKER, C. J., did not sit.