CONSTANTINE *v.* KALAMAZOO BEET SUGAR CO.

1. CORPORATIONS — OFFICERS — AUTHORITY — INDEMNITY — SUGAR BEETS.

Where lessees of land have agreed to raise and deliver to a beet sugar factory a crop of sugar beets, and, after partially raising the crop, it becomes doubtful whether the venture will prove a success, the secretary and manager of the factory has authority to make a contract with the lessor, who is also a

mortgagee of the crop, that, if he will furnish the money to complete the raising of the beets, the company will guarantee the parties against loss.

2. CONTRACTS—ESTOPPEL.

The lessees of land agreed with a beet sugar company to raise and deliver to the company 40 acres of beets at an agreed price. The season becoming unfavorable, the mortgagee of the crop refused to furnish money to complete the raising of the beets unless the company would give the parties the same indemnity it had given R.; and, upon being assured of such indemnity, he made further expenditures. *Held,* that the company could not deny that a contract was made.

GRANT, J., dissenting.

Error to Kalamazoo; Adams, J.    Submitted January 9, 1903.    (Docket No. 18.)    Decided March 23, 1903.

*Assumpsit* by Sidney M. Constantine against the Kalamazoo Beet Sugar Company upon a contract of indemnity. From a judgment for plaintiff, defendant brings error.    Affirmed.

*N. H. Stewart* and *Sheridan F. Masters,* for appellant.

*Howard & Howard,* for appellee.

The defendant owns and operates a beet sugar factory. May 1, 1899, two parties (Keys and Constantine) made a contract with the defendant by which they agreed to grow 40 acres of sugar beets, and sell the proceeds thereof at given prices to the defendant.    The part of the contract material to this case reads as follows:

"When this contract shall be signed, and a copy thereof be delivered to each party, no agent of said second party has any authority to change or alter the terms and conditions thereof."

October 26, 1899, this contract was assigned to plaintiff in the following written instrument:

"For value received we hereby sell, assign, transfer, and set over to S. M. Constantine (mortgagee of crop) all

our right, title, and interest in and to the within contract, together with all subsequent agreements made with the company in reference to the subject-matter contained therein."

Plaintiff owned the land on which Keys and Constantine agreed to raise the beets. He leased the land to them, and agreed to advance them money required for the purpose of putting in and cultivating the crop, and in the lease it was agreed that it "shall be a lien on said crops for the rent and any money or labor advanced, with interest on all except rent at seven per cent. per annum." The rental of the lease was $260, to be paid as the beets were delivered and paid for. August 17, 1899, plaintiff, in order to further secure him for rent and moneys advanced to Keys and Constantine, took a chattel mortgage from them for $675 upon the sugar beet crop.

The season was an unfavorable one, and when it became quite evident that there would be a loss to Keys and Constantine, and also to plaintiff, he, in July, interviewed Mr. Henry, the agent for the defendant, claiming that he represented both Keys and Constantine and himself, and that he made a parol agreement changing the contract, by which the defendant, through Mr. Henry, its agent, guaranteed plaintiff, as well as Keys and Constantine, from all loss. The language relied upon by the plaintiff to establish this contract reads as follows:

" Q. Mr. Constantine, at any time after this contract was made, did you hear any rumor in regard to some parties having a different contract from what Keys and Constantine had with the beet sugar company?

"A. I did. I went to Kalamazoo, and saw Mr. Henry, the secretary of the company, in the company's office in the city of Kalamazoo. The conversation I had that first time with Mr. Henry was along in July, about the time the drought was visiting our beets down in that part of the country; and, after hearing this rumor about a guaranty of contract with other growers, I went down there to see Mr. Henry at Kalamazoo. I had met Mr. Henry before, and, after talking with him about the condition of the beets and the drought, I stated to him that I under-

stood it was rumored that parties in Three Rivers had a guaranty against all loss on raising beets; that is, that they had a different contract from what we had; that I understood the contracts were all the same. He replied that they were all the same, and he says: 'Mr. Constantine, that is a mistake. Nobody has any different guaranty from you or Mr. Keys and Mr. Constantine. We are not doing business that way.' And he turned around to the desk to pull out to show me the other contracts with the other parties (I think I mentioned Dr. Sidmore and Mr. Reitz), and he said, 'We are not doing business that way, and I can show you;' and he turned around to his desk (we were sitting alone in his office on South Burdick street), and he says, 'I will show you, sir, nobody else has any different contract from yourself.' I said: 'Mr. Henry, your word is good. You don't have to show me. If you say so, it is all right. I want to understand that we are on the same footing as anybody else. You know I am furnishing money— I so informed you before. I am furnishing money, and have been, to put in these beets, and the prospects are not favorable, and I want to know we stand on the same footing as everybody else in regard to the raising beets;' and he says, 'You do.' I then returned to Three Rivers. I told him that I was furnishing money in the early part of July; that I had a lien on the crop. I met him here, introduced myself to him, and I told him for whom I was acting when I went to see him there in July,—for Louis Constantine and Ezra N. Keys and myself, as mortgagee. He simply said at that time that I had the same contract, —assured me,—and I returned home.

"After that I had a further talk with Mr. Henry, the secretary of the company. I came back to Kalamazoo; met Mr. Henry. I spoke about the crop; the prospects were poor; worms appearing in the crop about that time; and that I understood Mr. Reitz had a guaranty against loss, and he had assured me different; that we stood just the same as anybody else; and he was surprised that I would doubt his word. He went on to state that we could take a great many contracts anywhere if we could guarantee the loss, but we don't; we weren't doing business in that way; we were doing business on business principles. I said I supposed so, but I wanted it understood then and there that I was to stand just as well as William Reitz, or anybody else, in regard to any loss; that I had put up the money, the boys had worked hard, and we were going

to stop right there.   Mr. Henry then said to me:  'You
do stand just as well;  Mr. Reitz or no one else has got any
guaranty.'   I then said:   'All right, Mr. Henry.   With
that understanding—that we are to stand just as well as
Mr. William Reitz, or anybody else, against all loss—I
will go on and harvest this crop;  have the boys do it,
and deliver it to market.'   He said:   'Yes, sir;  it is all
right.   You shall have the same protection that Mr. Reitz
or anybody else.'   With that agreement, I went out and
went home.

"At that time I told him I appeared for Ezra N. Keys
and Louis F. Constantine and myself.   He knew what
my connection was with it.   In that conversation I told
him we were going to stop right there;  that the crop looked
bad;  that we would have to go to additional expense if the
worms attacked us as they had other fields;  I didn't pro-
pose to put any more money into it;  I was going to stop
right there.   I did put more money into it after that talk.
I talked to him about the treatment in case the worms
should come and bother us very much, and went back
home, and he wanted the boys to go ahead and buy imple-
ments and paris green, and work the crop the best we could
to save it.

"*Q.* You may state whether or not you would have
gone on and furnished any more money on that crop,
except under this arrangement, unless Mr. Henry had
made this arrangement with you.

"*A.* I would not; no, sir.

"I furnished the money from the beginning for this
crop.   The boys had no money at all.   I went on and fur-
nished the money, and got ready to treat the worms and
take care of the crop.   Next went on and harvested the
crop up to— Sent three car loads of sugar beets.   Then
we stopped.   We didn't think it would pay to harvest the
balance just at that time.   Prior to that time, of course,
this contract was assigned over to me.   I went up to
Kalamazoo after shipping three car loads, and saw Mr.
Henry, the secretary of the company, and I said to him·
'I don't believe it will pay to harvest the balance of the
beets, 16 acres there, or 20 (we called it about 16, the bal-
ance);  that the worms are bothering us very bad again on
that piece in particular;' and he said:   'Mr. Constantine,
if you don't think it will pay freight and expenses, why
don't harvest them,—16 acres.'   Of course, I didn't.   Of
course, I said we were all ready to go ahead, and would

harvest them if he desired to have me; but the opinion was of those on farms there that it would not pay, I told him. I told him about the matter, and left it to him to say whether we should go on and harvest them. He said 'No;' not to harvest them if I didn't think it would pay."

The original contract made by the company with Mr. Reitz contained an indemnity clause against loss. The crop was a failure. Plaintiff's suit is based upon this guaranty, and he recovered verdict and judgment for $1,318.74.

GRANT, J. ( *after stating the facts; dissenting*).    1. It is due to the defendant to say that the version relied upon by the plaintiff is contradicted by Mr. Henry, its agent. But the question must be determined by the case made by plaintiff's testimony as above given. Under his version of it, two contracts were made,—one with Keys and Constantine, the other with plaintiff. Plaintiff says he represented Keys and Constantine, and was acting for them as well as for himself, in this interview with defendant's agent.

Defendant sent agents through the country in the vicinity of its factory to obtain contracts. In all, about 1800 were made. All the contracts but three contained the provision absolutely prohibiting its agents from changing or altering the terms and conditions thereof after they were executed and a copy delivered to each party. Under plaintiff's theory, it would be impossible to make a binding contract of this character. There is not one word of evidence in this case tending to show any authority conferred by the board of directors upon Mr. Henry, their agent, to make such changes. On the contrary, there is uncontradicted evidence in the contract itself that no such authority was conferred upon him. It would also follow that any of the agents who took any of these contracts had the power to change them. The very purpose of such provisions is to remove all doubt as to the agent's authority. Plaintiff knew of this provision when he claims to have made the parol change. He is a lawyer. It was incum-

bent upon him to ascertain whether Mr. Henry had such authority, especially in the face of the express provision, known to him, that he did not possess it. It was incumbent upon plaintiff to prove the authority. There is no opportunity to apply the doctrine of apparent authority. Authority on the part of an agent to make a contract does not imply the authority on the part of the same agent to change it after he has reported and delivered it to his principal. Even Mr. Henry's statement to the plaintiff that he had authority would be no evidence of such authority. Mechem, Agency, §§ 706, 716; *Dobson* v. *More*, 62 Ill. App. 435; *Boynton* v. *Gaslight Co.*, 124 Mass. 197; *Davis* v. *Railroad Co.*, 131 Mass. 258 (41 Am. Rep. 221); *Simmons Hardware Co.* v. *Grocer Co.*, 64 Mo. App. 677; *Stoystown, etc., Road Co.* v. *Craver*, 45 Pa. St. 386; *Humboldt Mining Co.* v. *American Manfg. Co.*, 10 C. C. A. 415, 62 Fed. 356. The offer to show by Mr. Henry that he had no such authority was erroneously excluded by the court.

It is, however, urged that the defendant has had the benefit of this contract, and is therefore estopped to deny the authority of its agent. The complete reply to this is that there is no evidence that the defendant's directors had any knowledge whatever of this change. They had before them the written contract alone of Keys and Constantine, and had the right to act upon that contract as the measure of their rights and obligations. They had no notice that Keys and Constantine were acting under a subsequent parol agreement, and could not be estopped or bound by any such arrangement until they had knowledge of it. The learned counsel for plaintiff seek to bring the case within cases upon insurance policies, like that of *Beebe* v. *Insurance Co.*, 93 Mich. 514 (53 N. W. 818, 18 L. R. A. 481, 32 Am. St. Rep. 519). That case did not involve a change in the policy, but a waiver of conditions at the time the policy was given.

2. The contract to indemnify the plaintiff from all loss by reason of advances he already had made and should

thereafter make to Keys and Constantine is an unusual one. It is not within the power of the most general agent of a corporation to make. Such extraordinary power must be proven to have been expressly conferred or its exercise ratified by the principal. As already stated, the defendant had its 1800 contracts in its possession, fully determining the rights of all the parties thereto, and on which it was prepared to carry on its business. It is now urged that its agent had the authority to guarantee to indemnify from loss parties who would furnish money to the beet growers to carry out their contracts. There is serious doubt whether the board of directors would have the power to make such contracts. See *Lucas* v. *Transfer Co.*, 70 Iowa, 541 (30 N. W. 771, 59 Am. Rep. 449); *Filon* v. *Brewing Co.*, 15 N. Y. Supp. 57; *Davis* v. *Railroad Co.*, *supra*. The fact that three of the original contracts contained a provision guaranteeing against loss is no evidence of authority on the part of the agent to make this contract with the plaintiff. There is nothing in the record from which it can be implied that such authority was conferred upon Mr. Henry, or its exercise by him ratified.

Other questions are raised, but this disposal of the case renders it unnecessary to determine them.

Judgment should be reversed, and new trial ordered.

Moore, J. I do not agree with the conclusion reached by Mr. Justice Grant. The growth of sugar beets and the manufacture of beet sugar are comparatively new industries in this State. It is a matter of common knowledge that a beet sugar factory is an expensive plant, and depends upon a crop of sugar beets grown in its vicinity for its successful operation. It is also a matter of common knowledge that the market for a crop of sugar beets depends upon the proximity of a beet sugar factory, and that farmers would not think of growing a crop, as they do ordinary crops, without knowing where it is to be marketed, and approximately at what price. It is also a mat-

ter of common knowledge that contracts are made for the crop before it is planted, and, to insure a crop in some locations, the corporation itself frequently grows the crop. It follows naturally that, unless the farmer could feel a reasonable degree of assurance that his crop would be profitable, he would not engage in growing it. What is more natural than that the assurance should come from the corporation owning the plant which is to convert the crop into sugar? I cannot believe it is the exercise of an extraordinary power for the manager of one of these institutions, who, it is fair to presume, has special knowledge of the quantity and quality of the beets which may be ordinarily grown upon a given acreage, to say to a farmer who never has grown beets that the crop is a profitable one, and the company will gurantee him against loss if he will undertake to grow a crop, and to bind the company by such an agreement, when acted upon. It is difficult to see how the business could go on at all unless the manager and secretary are clothed with power to make such reasonable contracts as will result in the growth of the necessary crop to supply the ordinary needs of the plant. In *Whitaker* v. *Kilroy*, 70 Mich. 635 (38 N. W. 606), it is said:

" Mr. Brandon is shown by the testimony for plaintiff to have been the superintendent to do the general work and to keep the books. He is also described as superintendent and manager, and is testified to have made the contract with Mr. Kilroy on which the charges were all based. It also appeared that Kilroy's name nowhere appeared on the company's books as owing it anything. We think that persons dealing with such a corporation for work have a right to get their information from the person whom the corporation has put in charge, and cannot be required to go elsewhere, and that contracts so made are valid contracts, when relating to the ordinary concerns of such business. And if persons are not sustained in contracting with such superintendents, they can never be safe. They have no means of knowledge except inquiry somewhere, and the person put by the corporation in open charge of the business must have power, as to third persons, to represent it."

See, also, *Ceeder* v. *Lumber Co.*, 86 Mich. 541 (49 N. W. 575, 24 Am. St. Rep. 134); *Hirschmann* v. *Railroad Co.*, 97 Mich. 384 (56 N. W. 842).

The question of the measure of damages, presented by counsel, has been considered by the court. We think the trial judge properly charged the jury in relation thereto.

A more troublesome question is whether the minds of Mr. Constantine and Mr. Henry met, so as to constitute, in law, a contract. When this conversation was had (and, for the purposes of the case, it must be assumed that Mr. Constantine's version is the correct one), Mr. Constantine knew the company had guaranteed Mr. Reitz against loss, and Mr. Henry also knew it; and the plaintiff refused to go any further with the business unless the parties were indemnified to the extent that Mr. Reitz was, and, upon the assurance of being so indemnified, the further expenditures were made by the plaintiff. We do not think the company can be heard to say, under these circumstances, that no contract was made.

The judgment should be affirmed.

HOOKER, C. J., MONTGOMERY and CARPENTER, JJ., concurred with MOORE, J.