PEOPLE v. BAGWELL.

1. FALSE PRETENSES—ELEMENTS OF OFFENSE.
   The elements of the offense of obtaining property by false pretenses consist of a false statement as to a past or existing fact made with intent to defraud and resulting in the accomplished fraud (Act No. 328, § 218, Pub. Acts 1931).

2. CRIMINAL LAW—ALL ELEMENTS OF CRIME CHARGED.
   In the prosecution of a crime the people must prove all the elements of the crime charged beyond a reasonable doubt.

3. SAME—EVIDENCE.
   The proof necessary to convict one charged with a crime may be direct or circumstantial evidence.

4. FALSE PRETENSES—PAYMENT OF DIVIDENDS—EARNING POWER—INSTRUCTIONS—EVIDENCE.
   In prosecution for obtaining property by false pretenses, instruction that representation that company whose stock was sold was paying one per cent. per month per unit would be insufficient to support conviction as it was true but that if representation that wells owned by company were earning that sum was found to have been made with intent to defraud, a conviction would be justified under record disclosing defendant to have stated "that the wells were producing and they were paying one per cent. on the investment" was proper (Act No. 328, § 218, Pub. Acts 1931).

5. EVIDENCE—DECLARATIONS OF AGENT.
   The declarations of an agent are not admissible to prove an agency, but where there is testimony to show ratification, or original authority, or a holding out to the world as having authority, such declarations accompanying the act are admissible to show in what capacity he acted.

6. CRIMINAL LAW—REPRESENTATIONS OF AGENT—FALSE PRETENSES.
   In prosecution for obtaining property by false pretenses where there was evidence that person who made representations to complaining witness was the agent of defendant for the purpose of soliciting investments and that statements made by defendant to the agent were made for the purpose of enabling

---

Statement of agent as evidence of existence or extent of authority, see 2 Restatement, Agency, §§ 284, 285.

the agent to solicit more capital, the declarations of the agent to the complaining witness are admissible (Act No. 328, § 218, Pub. Acts 1931).

7. SAME—FALSE PRETENSES—EVIDENCE.

In prosecution for obtaining property by false pretenses, evidence of falsity of claims made as to earnings of oil wells owned by company whose stock was sold to complaining witness and by reason thereof she was defrauded *held*, sufficient to sustain conviction of crime charged (Act No. 328, § 218, Pub. Acts 1931).

Appeal from Bay; McCormick (James L.), J. Submitted October 17, 1940. (Docket No. 124, Calendar No. 41,144.) Decided December 10, 1940.

Cline Bagwell was convicted of obtaining money under false pretenses. Affirmed.

*Hubert H. Gaffney,* for appellant.

*Thomas Read,* Attorney General, *Edmund E. Shepherd,* Assistant Attorney General, and *Karl K. Leibrand,* Prosecuting Attorney, for the people.

SHARPE, J. Defendant was found guilty by a jury in the circuit court for the county of Bay upon an information charging that Cline Bagwell "On the 8th day of April in the year 1936 at the city of Bay City in said county, did with intent to defraud, obtain from Cora Brown $900 in checks and currency and 42 shares of preferred stock in the Consumers Power Company, of the value of $4,200 by falsely and fraudulently representing to Cora Brown that a net income of $1 per month was being and had been earned by each 1/7500ths interest in the following described oil lease interests owned by Michigan Producers & Refiners, Inc., to-wit, et cetera."

Defendant Bagwell was president and directing head of Michigan Producers & Refiners, Inc. It is

conceded that the sole responsibility for all of the operations of Michigan Producers & Refiners, Inc., was Mr. Bagwell's and he assumed full responsibility for all its operations. Therefore, its operations hereinafter will be referred to as Bagwell's operations.

Defendant Bagwell commenced the oil operation in question in 1933 and by 1936 he was the owner of working interests in the four blocks of leases described in the information. Defendant was not the complete owner of all of these leasehold interests, there being some outstanding working interests and overriding royalties.

The complaining witness, Cora Brown Camp, operated a grocery store in Bay City. She had no experience in the oil business. She was the owner of 37 shares of Consumers Power Company stock of the par value of $100 per share. She was also the joint owner with her mother of six shares of Consumers Power Company stock. About April 1, 1936, a Mr. Moore called upon complaining witness, stating that her mother desired to exchange the six jointly owned shares of Consumers Power Company stock for an interest in defendant's block of leases. Mr. Moore was a salesman in the employ of defendant and was employed to sell these units. As a result of this call by Mr. Moore, the complaining witness joined with her mother in signing over the jointly owned shares of Consumers Power Company stock to defendant for an assignment to her and her mother of a 6/7500th interest in defendant's oil leases. Following the delivery of this assignment of interest in the oil leases, Mr. Moore continued to call upon Mrs. Brown Camp in an effort to sell her additional interest in the oil leases.

On or about April 25, 1936, Mr. Moore delivered to her a check for $6 signed by defendant as divi-

dend for that month on the six units. About this time, Mrs. Brown Camp purchased individually a 20/7500th interest in the leases through Mr. Moore and paid for the same by giving defendant 20 shares of Consumers Power Company stock. About one month later, Mrs. Brown Camp was paid $26 as the dividend for the 20 units owned by her individually and the six units owned jointly.

During the months of May, June, and the early part of July, 1936, Mr. Moore continued to urge Mrs. Brown Camp to purchase more oil interests. Sometime during the month of July, Mr. Moore took Mrs. Camp to see defendant Bagwell, and, after discussing her investment with defendant, she purchased 17 additional units and paid for them with 17 shares of Consumers Power Company stock. For the month of July, Moore turned over to her dividends in the amount of $43. In August, 1936, Moore sold Mrs. Brown Camp eight additional units which were paid for by check, and for this month she received defendant's check for $51 as the dividends upon the 45 individual units and the six jointly owned units.

Mrs. Brown Camp continued to receive dividends from defendant at $1 per unit per month receiving the last one on the six jointly owned units in December, 1936, and on the 45 individual units in March, 1937. The only dividend received by Mrs. Brown Camp after this date was a 50-cent per unit dividend paid by the Michi-Oil, Incorporated (successor to defendant), in February, 1938. It is conceded that the oil wells never earned a dividend of $1 per month per unit.

Defendant appeals from the conviction and urges that his representation was that his company had been and was paying unit holders at the rate of $1 per month per unit; that such representation was true; and that the admission of testimony of state-

ments made by Moore not in the presence of defendant was improper and prejudicial to his interests.

The people claim that defendant, in order to induce Mrs. Brown Camp to invest, represented to her that the oil units in the past had earned or yielded a return of $1 per unit per month and that they were at the time of the investment earning or yielding this amount; and that there was sufficient evidence of a conspiracy between defendant and Moore with relation to this transaction, or sufficient evidence of agency, to warrant the trial court in admitting testimony of Moore's statements not made in the presence of defendant.

The information in this case was filed under Act No. 328, § 218, Pub. Acts 1931 (Comp. Laws Supp. 1940, § 17115–218, Stat. Ann. §.28.415). Under this statute, the elements of the offense consist of a false representation as to a past or existing fact made with intent to defraud and resulting in the accomplished fraud.

A part of the testimony relied upon by the people to sustain the charge made in the information is found in the testimony of Mrs. Brown Camp:

"*Q.* Whether or not you ever had any contact with Mr. Bagwell personally in regard to these oil units?

"*A.* I had all my dealings with Mr. Moore. I met Mr. Bagwell at one time when I went up to his office. Mr. Moore took me up there to meet him personally up there, was the first time.

"*Q.* When did you go to Mr. Bagwell's office—about what date?

"*A.* The first week in July, I think.

"*Q.* In 1936?

"*A.* Yes.

"*Q.* And you say you were invited up there by Mr. Moore?

"*A.*  Yes.

"*Q.*  When you got there to the office was Mr. Bagwell there?

"*A.*  No, he was not.

"*Q.*  Did you meet Mr. Bagwell in the office that afternoon?

"*A.*  Yes, he came in while Mr. Moore was showing me a map that had little tacks put in where the oil wells were, and he was showing that to me when Mr. Bagwell came in, and that is when I met Mr. Bagwell the first time.  Mr. Moore introduced me to Mr. Bagwell.

"*Q.*  What was said just at the time of the introduction?

"*A.*  Well, he told Mr. Bagwell that I had been investing some of my stock in some of the oil well stock, and that I had some more stock to invest and I was hesitating, and Mr. Bagwell said: 'Why don't you come in with us,' he said, 'I don't know of any proposition that is any better than this to invest anybody's money,' that he didn't know of any proposition where they paid one per cent. a month.

"*Q.*  Whether or not anything was said at that time as to the fact that the company had paid one per cent. a month on these units in the past? * * *

"*Q.*  Do you recall any further or other conversation that you had with Mr. Bagwell at the office that day?

"*A.*  Well, that the wells were producing and they were paying one per cent. on the investment.

"*Q.*  Who said that?

"*A.*  Mr. Bagwell.

"*Q.*  Anything further?

"*A.*  Mr. Moore told him that I was holding back because I didn't know but that I might have to use some of my money sometime, and he told me that any time I wanted to withdraw my money, part of it or all of it, I could, and he said: 'That's right, isn't it, Cline?' and Mr. Bagwell said, 'Yes,' so that seemed a good proposition to me."

The people also rely upon the following testimony elicited from Mr. Moore on cross-examination:

"In making these sales to Mrs. Camp, then Mrs. Brown, I told her the company was paying one per cent. a month. I had received that information from Mr. Bagwell. He told me that is what they were paying when I hired out to him. He told me that was the fact, that the company was paying one per cent. a month when I started out for him.

"I delivered these one per cent. dividend checks each month to the stockholders I had sold.

"Q. Why did you do that rather than mail them?

"A. Well, they were all people I knew, and a great many times I thought some of them would like to go up and see how the company was progressing, and if so I was ready to take them, and which I had many times. There wasn't a month but that I took two or three of them up and let them see what was going on and what the wells were like.

"I showed Mrs. Brown her mother's check which I was carrying in my pocket to deliver and perhaps two or three others before I delivered them. I wouldn't say I didn't.

"From January, 1936, to August, 1936, I wouldn't want to commit myself on about how many times a day or week I would be seeing Mr. Bagwell, because I don't know. Sometimes he would be gone for a week and sometimes he would be in every day maybe, and then maybe a week he wouldn't be in, so I couldn't tell you. I saw him on numerous occasions over that seven and half months' period.

"Q. Was there any time Mr. Bagwell told you these units were not earning one per cent. a month?

"A. Well, he said we would have to stop issuing checks because the money wasn't coming in. I cannot fix the date when he told me that. They stopped issuing checks about the time he told me.

"Q. I think the evidence in this case is that Mrs. Camp continued to get checks up until December,

1936. If that is the true fact, Mr. Bagwell didn't talk with you about reducing the dividends. until after 1936, did he?

"*A.*  No."

We recognize the rule that the people must prove all the elements of the crime charged beyond a reasonable doubt. Such proof may be by direct or circumstantial evidence. In the case at bar, the "gist" of the misrepresentation centers upon the statement made by defendant, "*Well, that the wells were producing and they were paying one per cent. on the investment.*"

The trial judge instructed the jury on this point as follows:

"The defendant cannot be convicted because of any representations made by either himself or Moore that the company was paying one per cent. per month per unit, because that was true. There could be no conviction for obtaining money under false pretenses when the pretenses or representations made were true. But if the representation made which you find to be false was that the wells were earning a dollar per month per unit, that is a representation which, if false and made with intent to defraud, in accordance with the law I am giving you, that would justify a conviction, if you find that beyond a reasonable doubt."

Under the above instruction the intent and meaning of' what defendant said was for the jury to determine, having in mind the nature of the transaction, namely, that it was not a loan to defendant or the company that he represented, but an outright sale by defendant of an interest in property.

Defendant urges that the admission of statements made by Moore not in the presence of defendant, which were objected to as being hearsay when intro-

duced, was error. The trial court gave the following instruction to the jury upon this question:

"If you find that the defendant Bagwell told Moore that the wells were earning one per cent. per month per unit, or one dollar per unit per month, with the intention that he carry that information along to the complaining witness, or anyone who might be dealing with the company, then the defendant would be liable for this statement of Mr. Moore's in carrying that information forward."

In the case at bar it appears that witness Moore was an employee and agent of defendant Bagwell and was held out as having authority to transact certain business for his principal Bagwell.

In *Hirschmann* v. *Railroad Co.*, 97 Mich. 384, 397, we said:

"The declarations of an agent are not admissible to prove an agency, but when there is testimony to show ratification, or original authority, or a holding out to the world as having authority, such declarations accompanying the act are admissible to show in what capacity he contracted."

See, also, *Mally* v. *Excelsior Wrapper Co.*, 181 Mich. 568; *Maryland Casualty Co.* v. *Moon*, 231 Mich. 56.

In the instant case there was evidence to show that Moore delivered to Bagwell at least 20 shares of Consumers Power Company stock; that Moore personally delivered to the complaining witness checks signed by Bagwell and represented as dividends on her investment; that defendant Bagwell in the presence of Moore told Mrs. Camp, "Well, * * * the wells were producing and they were paying one per cent. on the investment;" and that witness Moore testified:

"*A.*   Mr. Bagwell told me just what the setup was, that it had paid one per cent. a month, and I went to work on those grounds.

"*Q.*   Did he say it has paid one per cent. or one dollar a unit?

"*A.*   Well, sometimes they talked a dollar a unit, and sometimes they talked of one per cent., mostly one per cent. though I think."

In our opinion there is evidence from which a jury could determine that Moore was the agent of defendant Bagwell for the purpose of soliciting investments; and that statements made by Bagwell to Moore about the returns on the investments were made for the purpose of enabling Moore to solicit more capital. Under such conditions the evidence as to what Moore told the complaining witness was admissible.

The record shows that there was evidence of the falsity of the claims made as to the earnings of the oil wells; evidence that the complaining witness made the investments because of such representation; and evidence that by reason of the investment she was defrauded. The weight of the evidence was purely a matter for the consideration of a jury.

The questions involved were properly submitted to the jury and the conviction is affirmed.

BUSHNELL, C. J., and BOYLES, CHANDLER, NORTH, MCALLISTER, WIEST, and BUTZEL, JJ., concurred.