DETROIT, PLYMOUTH & NORTHVILLE RAILWAY CO. *v.* HARTZ.

1. SPECIFIC PERFORMANCE—CONTRACT TO CONVEY—EVIDENCE.
   On a bill to enforce specific performance of a contract to convey right of way to a street-railroad company, evidence examined, and *held*, not to show that defendant ever agreed to convey the right of way, but that complainant occupied under a parol license revocable at will.

2. STATUTE OF FRAUDS—SALE OF LAND—AUTHORITY OF AGENT—NECESSITY OF WRITING.
   A written contract for the sale of land entered into by an agent without written authority is void unless ratified or adopted by the principal. Section 9509, 3 Comp. Laws.

Appeal from Wayne; Mandell, J. Submitted January 10, 1907. (Docket No. 16.) Decided March 5, 1907.

Bill by the Detroit, Plymouth & Northville Railway Company against John C. Hartz to restrain the prosecution of an action of ejectment, and for the specific per-

formance of a land contract.    From a decree dismissing
the bill, complainant appeals.    Affirmed.

*C. C. Yerkes*, for complainant.

*Keena, Lightner & Oxtoby*, for defendant.

BLAIR, J.    The bill of complaint in this suit was filed
to enjoin further proceedings in an ejectment suit institu-
ted by defendant to obtain possession of certain lands oc-
cupied by complainant, and for the specific performance
of an alleged contract to convey a right of way over said
lands made by Della Holcomb, one of defendant's prede-
cessors in title.

The bill of complaint alleges that on July 1, 1898,—

" Said Della W. Holcomb was strongly desirous of in-
ducing your orator to construct in or along the said high-
way, known as the ' Plymouth Plank Road,' its electric
street railway, believing that such construction and its
subsequent operation would furnish convenient transporta-
tion for freight and passengers from said mill and resi-
dence property to Plymouth, Northville, and other points,
and consequently enhance the value of her said property.

" That in consideration of the conveniences to be ac-
quired by the construction of the said street railway along
said property in its present location, and the consequent
enhanced value of her said property, the said Holcomb
agreed with your orator to convey or release to your ora-
tor a right of way across said property over the land upon
which said railway was afterwards constructed and has
ever since been operated; that said Holcomb pointed out
to your orator the land which should be occupied by it and
was from time to time by herself and agents present while
the line of said road was being surveyed and the road
itself being constructed on and across said premises, and
that such occupancy and construction by your orator was
at all times with the knowledge, acquiescence, and direc-
tion of said Holcomb.

" That immediately after such consent and agreement
was made, as is mentioned in the last preceding section,
your orator proceeded to lay out and construct its trestle
and bridge across the outlet of said millpond at a great
expense, to wit, at a cost of $5,000 and upwards; that

said bridge was so constructed by it in reliance upon the consent, acquiescence and agreement of said Holcomb on the said lands which were before the construction of said bridge by your orator of little value to it, but by the construction of such bridge has become of great value, to wit, of the value of $1,000 and upwards.

"That since the construction of said bridge by your ora-tor the said street railway has been in continuous operation and is now in operation by your orator along and over said bridge, yet, although your orator has performed and executed its agreements in the construction and operation of said railway, yet the said Holcomb has failed, neglected, and refused to convey to your orator a release or right of way of the said lands so occupied by your orator as agreed upon as hereinbefore set forth."

Della Holcomb acquired her title to the property in question by warranty deed from her husband, Henry W. Holcomb, executed January 15, 1898. October 25, 1898, Della Holcomb conveyed the property by warranty deed to Frank T. Norris, and on November 24, 1900, Norris deeded to defendant, Hartz. All of the negotiations on the part of Della Holcomb in question in this suit were conducted by Henry W. Holcomb as her agent, but without written authority from her. The only testimony in the record as to any interviews with Mrs. Holcomb is that of Mr. Russell, the vice president and manager of complainant, as follows:

" Q. When you had these talks with Mr. Holcomb, did you see Mrs. Holcomb at any time ?

"A. I saw Mrs. Holcomb two or three times during the entire work there when I would be calling for Mr. Holcomb, and on one occasion I went and saw her to see about this location of the track in front of his place, and she referred me to him, *saying that he had had no conversation with her on the subject.*

" Q. You understood that he was acting as her agent ?

"A. I was referred to him by her."

Complainant's testimony as to the alleged agreement was given by Mr. Russell and Mr. Waldo, who represented complainant in the location and construction of the road. The substance of their testimony is that they

were considering two routes for the railway near the Holcomb property, and that Holcomb was very anxious that they should construct the railway along the plank road in front of his property because of the increase in value of the property and particularly the mill, and that Holcomb claimed title to the lands included by his fences by adverse possession, but the witnesses considered the fences to be in the highway and subject to removal.

Russell testified:

" There was considerable conflict about where the property lines lay. Mr. Holcomb owned the icehouse, which was filled with ice, and it was desirable to get it out of the way. About 16 feet of it was in the way, and the company agreed with him and paid him $200 if he would not prevent us from taking it down. Our men took it down and destroyed it. No money was paid for the land south of the stream. We had many conversations in which he sought to induce the location of the railroad on the Plymouth & Northville plank road, instead of on the Bradner or easterly road, and *until our bridge was built no question of money came between us at all, and then only in reference to the icehouse.* North and south of the river or millpond the railroad was located upon the public highway. He said he had property facing the Plymouth & Northville road which he wished to subdivide and build up, and he said the railroad would bring it into the market. He was desirous to have us pass the mill property so that he could get a spur into the property to facilitate business. In consideration of these benefits, he agreed to facilitate the building of the road. From our standpoint he did not have anything to do with the right of way. Our notion then was we were running in the highway. There were places in his property that were not in the highway, and we moved back his fences with his consent. He made a plat of the property along the road, and told me that he sold one or two lots out of it, one on which a house was built, and another.

" *Q.* Was there any talk before you assumed possession or took possession; and before you constructed your road was there any talk with reference to his executing any papers with regard to this right of way?

" *A. The first time that he held us up for $200 I suggested that he should make us a quitclaim deed,* and

he explained to me then that the property was in the name of his wife, and that he was contemplating going through bankruptcy proceedings at the time, and that later he would provide for it.

" *Q.* Before you took possession at all was there talk about releasing the right of way?

"*A.* I would not be positive on that; I think there was about the time we negotiated for the icehouse.

" *Q.* After the road was constructed, did you go to him with reference to a release of this right of way?

"*A.* Yes; I asked him once for such a paper and was put off.

" *Q.* What did he say then?

"*A.* I think he delayed for some reason which I forget.

" *Q.* Did he refuse to make it?

"*A.* No, sir.

" *Q.* Did he make any reply that you remember as to the delay?

"*A.* My impression is that his wife was away or something like that at the time.   *   *   *

" *Q.* With reference to the land that he consented to your occupying it, where was the road built?

"*A.* Upon the exact location agreed to by Mr. Holcomb.

" *Q.* What did you give him for the use of that land? *What was he to receive for its use?*

"*A. Nothing except the presence of the road, which he had been seeking for years.*   *   *   *

" *Q.* How long before August or September, 1899, was your first interview with Mr. Holcomb?

"*A.* I had been meeting him for the better part of that year, off and on; that is, for the year 1899.   I think the matter had not arisen between me and Mr. Holcomb previous to January, 1899.   In building the stretch from Wayne to Northville the company negotiated with probably 15 property owners in all.   We got a paper signed from them.   *   *   *

" *Q.* Now, you had some sort of a permit from the owners of the other 14 pieces?

"*A.* In some cases we had leases and in other cases we had quitclaim deeds; but generally quitclaim deeds.

" *Q.* And this piece in here for 800 feet is the only place in which private property has come into question in which you did not have some sort of a writing?

"*A.* We did not have any question that that was private property.

"*Q.* This is the only piece which there seems to be some question now in which you did not have some writing?

"*A.* I think so.  *  *  *

"*Q.* You regarded the approach across the outlet—that bridge there, which you constructed at an expense of $3,000—your understanding was that that was in the highway?  *  *  *

"*A.* Yes, sir.

"*Q.* And you acted under those ideas that we have given, that along this whole strip Mr. Holcomb was not giving you anything except what belonged to the highway?

"*A.* Yes, sir.

"*Q.* And, of course, under those circumstances you did not bargain as to whether he should give you any quitclaim or anything of the kind?

"*A.* When the matter came up later, I was advised that we should get a quitclaim deed from him, lest he might try to hold us up later.

"*Q.* He said that he would give you some paper, but that he was going through bankruptcy?

"*A.* Yes; that is what I understood.

"*Q.* What else did he say?

"*A. He said that the property was in the name of his wife temporarily, and when he got it out he would give us a quitclaim deed.*

"*Q.* You knew at that time that it was in the name of his wife?

"*A.* Yes, sir.  *  *  *  There were no promises made at any time to Mr. Holcomb as to what the railroad company might do.  If any were made by others than myself, it was without authority, because no such promise or consideration could be given by the railroad company without my approval."

Waldo testified:

"*Q.* What did Mr. Holcomb say as to your having a right of way there?

"*A.* Why, as I understood the discussion, if we ran down by the mill, and put in a spur track when the line was complete, it would be entirely satisfactory, and he would move back his fences.  *  *  *  The whole outfit south of the pond was discussed by Mr. Holcomb and I. North of that I think Mr. Russell did the negotiation. South of that point we discussed it.

"*Q.* That is from what point?

"*A.* The spur would come up south of the pond to reach the mill. We wanted a permanent affair. Practically, if we would have the road located there, that is the compensation that he would get for his property. He first objected to moving his fence back from the Bradner road to his south line. * * * It was finally decided to allow us to move it back to where it was placed.

"*Q.* Decided by whom?

"*A.* By Mr. Holcomb and I; that we should put it in upon his request, a siding or spur to reach his mill door.

"*Q.* I understood, Mr. Waldo, that between the Bradner road and this point that you and Mr. Holcomb joined in the selection of the right of way, was there any fence there?

" *A.* No, sir.

" *Q.* What did you say as to the length of time that the railroad company should occupy this land?

" *A.* I don't remember anything; his general position was that the railroad would occupy it under the terms of its franchise.

" *The Court:* I will exclude that.

" *Q.* What, if anything, was said by him with reference to releasing this right of way later on?

" *A.* Nothing to me that I can recollect. He took it for granted that this land belonged to him by adverse possession, and I considered him an obstructor there, and that the highway commissioner should move his fences back. We did not want any difficulty, and we arranged it amicably as we did. Didn't have any unkind words during the discussion.

" *Q.* What did you say to him as to reason why he should give you the right of way?

" *A.* Why, I did not understand at any time in the discussion that he was giving us a right of way outside of what was the highway originally. If the fences had been moved back to their proper line, that would give us ample road. He conceded that we should build the road, and we agreed to put in the spur. * * * I took the ground all the time that the highway commissioner had the right to tear his fences down and get it out of the road, and that we could build the road where it was located. But we didn't want difficulty, and we finally settled the matter by the decision that we might move the fence back on the line where it is if we should build a road and put in a spur to his mill.

" *Q.* Then the road was built and the fence moved back by his consent ?

" *A.* Yes, sir.  *   *   *

" *Q.* Did you consider that north of the Bradner road the road included the whole strip where your track was going ?

" *A.* Yes, sir.

" *Q.* And, so that is the reason why you did not have any more definite arrangements with Mr. Holcomb ?

" *A.* Yes, sir.

" *Q.* You did not think it was necessary ?

" *A.* No, sir.  *   *   *

" *Q.* Did you make any promises on behalf of the railroad company to Mr. Holcomb with regard to that track ?

" *A.* Yes, sir.

" *Q.* Now, that was in consideration of what ?

" *A.* The settlement of this matter.

" *Q.* Of the whole matter?

" *A.* Yes, sir.

" *Q.* And that consideration was what ?

" *A.* The moving of the fence back on the line and the rebuilding of it south of the Bradner road, and after the road was completed within a reasonable time, when he requested it, we should put in a side track to the mill."

Henry W. Holcomb testified:

" The talk about the icehouse was after the time that the fences were moved back from here to the south.  I think Mr. Waldo first talked with me about wanting the fences moved south of the Bradner road.  *   *   *

" *Q.* What was the agreement between you ?

" *A.* He said that he would move my fence back.  I didn't say much, but he was to move my fences back without any cost to me, put a drain along the road, and connect with the present drain that was there then; also there were matters about crossing in the fields so I could get to my crops.  That was the substance.

" *Q.* Was anything said about a spur track ?

" *A.* They said they would put in a spur track.  *   * * There was nothing said to me with reference to giving a quitclaim deed.  I don't know, but they did talk of a writing.  I refused.  I said, ' No; I will not deed anything.  You can go there if you like, but I will not sign any writing.'  And I never did.  A writing was brought to me to be executed to have me sell or give permission

for that use. I objected to giving them any deed or anything of that sort. I didn't know what kind of service we would have, and I didn't want to get into litigation over such things. I thought it was not necessary as long as I gave them the right there. I gave them my consent. No time was mentioned, of course. * * * Except for the money agreed upon to compensate me for the destruction of a part of the icehouse, there was no consideration of any kind paid to me or Mrs. Holcomb for the laying of this track where it is. * * * So far as this property was concerned and the other real estate in her name, I was acting as her agent. * * *

"Q. What was the talk generally by you as to whether in talking you were talking for your wife?

"A. Yes, sir; at that time I was acting as her agent. * * * The principal thing with me, I wanted the road to run direct, and incidentally it would help my mill. It would run in front of it.

"Q. And they would put a spur track in there?

"A. They promised to do it.

"Q. Have you asked them for a spur?

"A. I never did ask them to my knowledge. * * * I regarded it as desirable to have a spur to the road. I was shipping flour and some wheat in and out, and I wanted it for that purpose.

"Q. And it was worth money to you?

"A. Yes; no question about it.

"Q. Worth quite a little?

"A. Yes. * * * Before the road was built I know where it was to be built.

"Q. And you told him that they could have the right of way?

"A. I told him that they could go along there; I never objected to it.

"Q. You told them that they might have the right of way?

"A. Whatever you call it.

"Q. Did you tell them that they could have the right of way where you knew that they were going?

"A. I don't think they ever put it in those words. I told them that they could locate it and use where they did.

"Q. You knew that they were an incorporated railway?

"A. I did not know that; no, sir. I supposed it. No part of the money paid to replace the icehouse went to pay

for the right of way—not a cent. After the road got north of the bridge I knew where it was going. They moved it there at my suggestion. They had to deflect it a little to the west.   *   *   *   Nothing was said about how long they would stay there. It was implied that they would stay there. I cannot say how long that implication ran for. I did not calculate that I would ever want to put them off. I did not think there would be any necessity.

"*Q.* Did you lead Mr. Waldo or Mr. Russell to believe that you never intended to put them off?

"*A.* Nothing was said about it.   *   *   *   I told the facts about this property to Mr. McAllister, who acted for Mr. Hartz, to whom I sold the property. I represented to him that the road was a tenant at will merely. I didn't say they had no substantial rights. I don't know anything about that. I told them that I had never received any pay and never had signed any paper. I did not tell them that they could be put off at any time. I did not know that, and I don't know it now.   *   *   *   I told McAllister substantially what I have testified to here."

The circuit judge held:

" Complainant occupied and used the lands in question under a parol license that contained no terms as to the life of the franchise. It remains only to determine whether such a license is revocable at will, or whether a court of equity should read into the license something that was not discussed by the parties thereto at the time the license was granted. It seems to me that this case is ruled by *Minneapolis, etc., R. Co.* v. *Marble*, 112 Mich. 4.

Decree was entered dismissing the bill of complaint, from which decree complainant has appealed to this court. Counsel for appellant contends that complainant was entitled to relief upon two grounds:

" *First.* Upon an oral contract for the conveyance of a right of way over the land in question upon a valid consideration, which contract has been substantially performed on the part of the complainant herein by the expenditure of large sums of money in the construction of an electric railway and its subsequent operation.

" *Second.* Upon a voluntary dedication of the land in question to the uses of the public based upon a valuable consideration."

We agree with the circuit court that the complainant has not shown by a preponderance of the evidence any promise in behalf of Mrs. Holcomb to execute a conveyance or any writing whatever. Mr. Holcomb denies that any such agreement was made, and Mr. Russell would not say that there was any such arrangement before the company took possession of the land; and his testimony indicates that the talk about a deed or release was after the bridge had been built. The testimony of Russell and Waldo clearly shows that in their minds it was unnecessary to have any such agreement, and makes it probable that Mr. Holcomb's testimony is true. The conclusion of the circuit judge was therefore correct upon the ground assigned by him, and, we think, for another reason.

Mr. Holcomb had no authority to make such an agreement as claimed by complainant. He could only represent his wife as her agent under written authority from her. Even if Mr. Holcomb had executed as agent a written contract with complainant covering every point, such contract would have been void as to Mrs. Holcomb, unless afterwards ratified or adopted by her. Section 9509, 3 Comp. Laws; *Powell* v. *Conant*, 33 Mich. 398; *Colgrove* v. *Solomon*, 34 Mich. 494; *Dickinson* v. *Wright*, 56 Mich. 42. There is no evidence in the record that Mrs. Holcomb knew anything about the details of the negotiations, or what agreement was finally made by her husband. Mr. Russell testified that in the only talk he had with Mrs. Holcomb she told him that her husband had had no conversation with her on the subject, and, so far as this record discloses, there has been no oral contract made with, known to, or recognized by, her.

The decree is affirmed, with costs to defendant.

McALVAY, C. J., and GRANT, MONTGOMERY, and OSTRANDER, JJ., concurred.