SHUELL et al. v. LONDON AMUSEMENT CO.

W & W THEATER CO. v. SAME.

WISPER et al. v. SAME.

LONDON AMUSEMENT CO. v. SHUELL et al.

Nos. 8675–8678.

Circuit Court of Appeals, Sixth Circuit.

Nov. 6, 1941.

Wm. Henry Gallagher, of Detroit, Mich., for W & W Theater Co.

Wm. Henry Gallagher, of Detroit, Mich., (Heal & Deeley, of Detroit, Mich., on the brief), for Frank W. Shuell, et al.

Wm. Henry Gallagher, of Detroit, Mich., (William H. Kaplan, of Detroit, Mich., on the brief), for Lew Wisper, et al.

Harold H. Emmons, of Detroit, Mich., (Ralph E. Routier and Harold H. Emmons, both of Detroit, Mich., on the brief), for appellee and cross-appellant.

Before SIMONS, HAMILTON, and MARTIN, Circuit Judges.

MARTIN, Circuit Judge.

These consolidated cases have been heard on appeal from a decree for specific performance of a lease-renewal contract and from an auxiliary permanent injunction. The cross-appeal challenges the correctness of one paragraph of the decree, prescribing conditions precedent to the relief granted.

Appellant Lillian M. Shuell, owner of the spacious Lincoln Square Building in Detroit, which contained some one hundred residential apartments, twelve stores, a warehouse, and a theater, placed her husband, appellant Frank W. Shuell, in charge of the property and directed the superintendent of the building to follow his instructions.

The husband maintained an office in the building, and there transacted all business concerning the building; negotiated and prepared contracts and leases subsequently signed by the wife, endorsed and deposited rental checks, and exercised complete supervision. His activity was in marked contrast to the utter inactivity and apparent abdication of control by the real owner, his wife.

In the early part of 1933, Israel J. London and his son, Burton W. London, operators of neighborhood motion picture theaters, negotiated with Frank W. Shuell for a lease on the run-down and vacant Lincoln Square Theater, situated in the Lincoln Square Building. These negotiations led to the signing, on February 16, 1933, of a memorandum lease agreement with Frank W. Shuell for a term of five years from March 1, 1933, at a stipulated rental.

On March 20, 1933, a formal lease of the premises, in conformity with the memorandum agreement, was signed and acknowledged by Appellant Lillian M. Shuell. In due course the appellee corporation, London Amusement Company, owned and controlled by the Londons, became lawful assignee of the lessees, Israel J. London and Burton W. London.

The record reveals no denial of the testimony of Israel J. London, corroborated by several witnesses, that when the memorandum agreement presented by Frank W. Shuell was found to bear the signature "Lillian M. Shuell by Frank W. Shuell," the husband, upon being asked the reason therefor, asserted that he possessed a power of attorney from his wife. His authority to sign for her was not thereafter questioned.

Immediately after the preliminary lease agreement was signed and about a month and a half before the execution of the formal lease, keys to and possession of the theater were delivered to the Londons. Appellant Frank W. Shuell instructed them to do nothing to the theater without his consent, and personally and actively supervised the cleaning, reconditioning and installing conducted by the Londons.

Appellant Lillian M. Shuell gave them no instructions whatever. Indeed, they received no communication from her until June 21, 1937, when she wrote to them denying their claim to an extended term of the lease. Prior thereto, she had never in any way or at any time questioned the authority of her husband or repudiated any of his dealings with the lessees.

The record is replete with evidence of dominant supervision by Frank W. Shuell, as if he were the alter ego of the owner. Improvements made by the lessees were substantial and expensive, embracing, in addition to repairing, redecorating, re-wiring, and sound echo deadening, the installation of projecting and talking equipment and a cooling system.

Rental checks from the lessees were drawn to the order of Lillian M. Shuell

304

and mailed to Frank W. Shuell, and were endorsed "Lillian M. Shuell by Frank W. Shuell," with "A" or "P.A." appended to the signature. The obvious meaning of the appended letters was "Attorney" and "Power of Attorney." Especially does this appear from the testimony that Lillian M. Shuell delivered to her bank-of-deposit notice in writing that checks drawn upon funds deposited in the name of "Lincoln Square Building" (the trade-name under which the business of her building was transacted), and all notes, drafts, bills of exchange and commercial paper of Lincoln Square Building were authorized to be signed by Frank W. Shuell.

There is abundant evidence to support the finding of the District Court that "although there is no direct proof of the existence of any written power of attorney in Frank W. Shuell from his wife, there is no denying that Frank W. Shuell was the manager and general agent of his wife's theater property; that she had given him practically carte blanche to represent her interests; that he negotiated all leases therefor; that his was the final say and that the necessity of her signature to a lease had been reduced to a matter of form only."

In the fall of 1935, Appellant Frank W. Shuell insisted that additional improvements be made in the Lincoln Square Theater, asserting that the Londons were making a lot of money there and were expending it on their other theaters. The rejoinder of the Londons was that they could afford no further investment in the Shuell property, unless they were granted an extension of the lease.

After considerable discussion of the terms and conditions of renewal, appellant Frank W. Shuell wrote to Israel J. London the following letter, dated October 25, 1935:

"Since our discussion of last Wednesday of a new lease on the Lincoln Theater for a period of five years, from March 1st, 1938, I have given the question a great deal of thought, which has been responsible for the delay in advising you my decision.

"Your offer is, I believe, a rental of $250.00 per week, plus 15% on all overage from $1500.00 to $2000.00 per week in box office receipts and 20% overage on all box office receipts over $2000.00 per week. You propose to put on a new front, install new seats, install false ceiling for acoustical purposes and various other improvements—

these improvements all to be paid for on or before the expiration of the present lease, which is March 1st, 1938. It is further understood that all improvements made by you are to revert to the owner of the property at the expiration of the lease.

"There are just two conditions of this offer which I cannot sanction. The first one is that the basic rent of $250.00 per week is too low and the second is that I should like to have the percentage on the overage eliminated. This system is a source of more or less an annoyance and we would be very much better satisfied to have it eliminated.

"If you wish to lease the theater for a period of five years at the expiration of your present lease, we will accept a rental of $300.00 per week, payable weekly in advance, eliminating all overage arrangements.

"This proposition involves an increase to you of only $333.00 per week in box office receipts over and above the $1500.00 base, which you established, and I am sure would make a much more satisfactory proposition for both of us than the plan which you proposed.

"Trusting that this proposition meets with your approval, I am,
"Sincerely yours,
"Frank W. Shuell."

On November 27, 1935, Israel J. London and Burton W. London, in compliance with the advice of their attorney, signed their acceptance on a duplicate of this letter and mailed the same to Frank W. Shuell. The transmittal letter, signed by Israel J. London, read, as follows:

"I am enclosing duplicate copy of your letter of November 25 which I and Burton have accepted and signed. Hoping that our future business relations will be as pleasant as they were in the past. I will do my utmost to make that possible. I am going to start and get busy to make all preparations in fixing up the theater.

"Thanking you for all past favors, I am
"Sincerely yours."

Also under advice of their attorney, the Londons signed their acceptance on the original letter from Frank W. Shuell, dated November 25, 1935. This original letter was introduced in evidence.

A few days later, Appellant Frank W. Shuell invited the Londons, father and son, for a "little celebration" in the building's Club House, where food and drinks were

**305**

served by Building Manager Thomas, and Shuell expressed pleasure that the Londons had finally accepted his terms. The time within which the improvements were to be made was discussed.

There is substantial evidence to support the fact-findings of the District Court that appellee partly performed requirements as to the specified improvements to be made by lessees. As found by the District Court, the lessees, in December, 1935, covered with Nu-wood the side walls below the velour, using some four thousand square feet for that purpose; in 1936, procured designs and a bid for a new marquee, employed an architect to design alterations for the lobby and box office, and furnished additional Nu-wood; and in January 1937, again furnished Nu-wood, the installation of which by appellee's contractor continued until May 1, 1937. On that date, an article appeared in "Box Office," a theatrical trade journal, announcing that Wisper and Wetsman Theaters had taken over the Lincoln Square Theater from I. J. London and would actually operate it within the next month.

Upon reading this advertisement, Israel J. London, much surprised and agitated, attempted to communicate with Wisper and Wetsman and was informed by their agent that they had obtained a lease upon the Lincoln Square Theater. This information was later confirmed to London by Appellant Lew Wisper.

London and his attorney next called upon Frank W. Shuell, who admitted that a lease of the theater had been executed by his wife to appellants Lew Wisper and Frank A. Wetsman, and denied that he had written the lease-extension letter to London. The disturbing lease had been executed on April 21, 1937, by Lillian M. Shuell, as lessor, to Appellant W & W Theatre Company, a corporation controlled by Lew Wisper and Frank A. Wetsman, who guaranteed personally the performance by the lessee of the covenants and conditions of the lease.

Israel J. London made many futile attempts to trade with the appellants, Wisper and Wetsman, for the rights acquired by their controlled corporation under its lease from Mrs. Shuell.

On February 28, 1938, next-to-the-last-day of the term of the original lease of March 20, 1933, appellant Lillian M. Shuell was personally tendered $300 as payment of the first week's rent under the renewal lease. The tender was made by an attorney for the Londons. This attorney testified: "She seemed very hesitant and didn't know whether to take it and she said she didn't know whether she should take it or not. She thought she better not take it. Then she asked me why I hadn't given it to Mr. Shuell as usual. I told her that we tried to give it to Mr. Shuell as usual, but that we couldn't locate him, and then she said she would try to get in touch with him and she went to the telephone and called. I don't recall whether she made one call or two calls, but she couldn't locate him. She then came back and again stated that she was doubtful whether she should take the money or not, but she finally decided she better not and requested of me that I take it up with Mr. Shuell the next day in the usual course of business."

On this substantial evidence, the District Court correctly decreed specific performance of the lease-renewal agreement offered in the letter of October 25, 1935, from Frank W. Shuell, acting for his wife, Lillian M. Shuell, and duly accepted by appellee; and appropriately enjoined the Shuells, together with Appellants W & W Theater Company, Lew Wisper and Frank A. Wetsman, from interfering with the peaceful possession and occupation by appellee of the demised premises during the duration of the term of the renewal lease, commencing March 1, 1938, and terminating February 28, 1943.

While there is no written or express evidence that the wife who owned the property involved in this litigation executed a power of attorney or other writing authorizing her husband to act for her in connection with either the original lease to the Londons or the renewal thereof, her course of conduct throughout, in failing to repudiate his actions in her behalf but on the contrary in repeatedly ratifying his dealings and accepting the benefits therefrom, constitute in this case both a holding out of her husband as her general agent to deal with her property and an ultimate ratification of his action in renewing the London lease. The same procedure of her husband in the making of the original lease, subsequently ratified by her, was pursued with relation to the renewal up to the instant when she, for the first time, repudiated his action. This repudiation came only after appellee, in reasonable reliance upon her manifestation, had changed its position to its detriment.

When appellee received notice from appellant Lillian M. Shuell that she had ignored her husband's renewal-lease agreement, appellee had not only partially performed its obligation thereunder, by installing some three thousand dollars worth of the twenty-five thousand dollars worth of required improvements, but had otherwise changed the position of its owners with respect to other business diverted to enable lessees to perform their renewal covenants.

■ One who manifests to a third person that he has formally authorized an agent is liable to such third person as fully as if such authorization had been formally given, if the third person changes his position in reasonable reliance upon the manifestation.

Appellant Frank W. Shuell had represented to the Londons that he held a power of attorney from his wife when the original lease was made. She confirmed this asserted power by signing the lease prepared by her husband in conformity with the memorandum agreement. She continuously accepted the full benefits of the lease; and, when tendered the first week's rent for renewal, referred the attorney for the Londons to her husband. She has never under oath contradicted her husband's authority to lease in her behalf. Though possessed of full knowledge of the actualities, she failed to take the witness stand. In fact, she offered no evidence whatever upon the trial of this case.

■ Failure to produce evidence within the control of a party raises the presumption that, if produced, the evidence would operate against him; and every intendment will be resolved in favor of the opposite party. Brandt v. C. F. Smith Co., 242 Mich. 217, 222, 218 N.W. 803.

The District Court rightly received and considered the representations of Frank W. Shuell as to his general agency.

■ In Hirschmann v. Iron Range & H. B. Railroad Co., 97 Mich. 384, 397, 56 N.W. 842, 846, the Michigan Supreme Court said: "The declarations of an agent are not admissible to prove an agency, but when there is testimony to show ratification or original authority, or a holding out to the world as having authority, such declarations accompanying the act are admissible to show in what capacity he contracted." This quotation was approved in Mally v. Excelsior Wrapper Co., 181 Mich. 568, 573, 148 N.W. 443.

■ The Londons were within their legal rights in assuming that the general agency of Frank W. Shuell would continue until in some manner they were notified of its termination, or until put upon inquiry by facts in their possession. McAfee, Inc., v. Great American Indemnity Co., 289 Mich. 143, 147, 286 N.W. 189.

■ It has been observed that the 16th paragraph of the original lease of March 20, 1933, contains the provision that, "The lessees further expressly agree and acknowledge that no person is authorized on behalf of the lessor to enter into a verbal lease, and that they will claim no verbal lease for possession of the demised premises after the expiration of the aforesaid demised term." There would be no equity in permitting this clause to nullify the effect of ratification and part performance of a contract in writing, where only the authority to execute it is brought in question.

The position assumed by appellants rests upon the Michigan Statute of Frauds. Michigan Statutes Annotated, Vol. 19, § 26.906; C.L.1929, § 13411; and Michigan Statutes Annotated, Vol. 19, § 26.908; C.L. 1929, § 13413.[1]

■ But in Detroit, etc., R. Co. v. Hartz, 147 Mich. 354, 110 N.W. 1089, cited by appellants, the holding was that a contract

---

[1] [Sec. 26.906] Statute of frauds; conveyance of interest in lands other than one year lease. Sec. 6. No estate or interest in lands, other than leases for a term not exceeding one [1] year, nor any trust or power over or concerning lands, or in any manner relating thereto, shall hereafter be created, granted, assigned, surrendered or declared, unless by act or operation of law, or by a deed or conveyance in writing, subscribed by the party creating, granting, assigning, surrendering or declaring the same, or by some person thereunto by him lawfully authorized by writing."

"[Sec. 26.908] Same; contract for interest in lands other than one year lease; sales at auction. Sec. 8. Every contract for the leasing for a longer period than one [1] year, or for the sale of any lands, or any interest in lands, shall be void, unless the contract, or some note or memorandum thereof be in writing, and signed by the party by whom the lease or sale is to be made, or by some person thereunto by him lawfully authorized in writing: Provided * * *."

in writing for the sale of land entered into by a husband as agent for his wife without her authority in writing is void under the Statute of Frauds, unless ratified and adopted by her as principal. Thus, from appellants' own citation, it appears that, in Michigan, ratification of a contract may withdraw it from the ban of the Statute of Frauds.

Likewise, in Dickinson v. Wright, 56 Mich. 42, 47, 22 N.W. 312, Chief Justice Cooley recognized that distinct acts of ratification could legalize contracts invalid under the Statute of Frauds.

Upon the issue of part performance, appellee is supported by Michigan Statutes Annotated, Vol. 19, Sec. 26.910; C.L.1929, Sec. 13415, which provides: "Nothing in this chapter contained shall be construed to abridge the powers of the court of chancery to compel the specific performance of agreements, in cases of part performance of such agreements."

Engle v. Engle, 209 Mich. 275, 176 N.W. 547, also buttresses the position of appellee; for there, a decree for specific performance was predicated upon partial performance of an agreement in circumstances no more compelling than those of the instant case.

■ The Supreme Court of the United States, in Williams v. Morris, 95 U.S. 444, 457, 24 L.Ed. 360, elucidated the principles upon which specific performance of a parol contract may be decreed upon the ground of part performance, in the face of the requirements of the Statute of Frauds. The summarization of the Supreme Court appears pertinent here: "Where one of the two contracting parties has been induced or allowed to alter his position on the faith of such contract, to such an extent that it would be fraud on the part of the other party to set up its invalidity, courts of equity hold that the clear proof of the contract and of the acts of part performance will take the case out of the operation of the statute, if the acts of part performance were clearly such as to show that they are properly referable to the parol agreement."

■ The insistence of appellants that the contract relied upon is incomplete is not impressive. As was said in Waites v. Miller, 244 Mich. 267, 272, 221 N.W. 171, 173: "Courts do not favor the destruction of contracts because of indefiniteness and hold that uncertainty may be removed by subsequent acts, conduct, declarations, or agreements of the parties."

See Walsh v. Oakman, 199 Mich. 688, 165 N.W. 737, which, by analogy, supports the sufficient definiteness of the contract under consideration here. The conditions imposed in the decree of the District Court in granting specific performance seem equitable and just.

Furthermore, Michigan Statutes Annotated, Vol. 19, § 26.909; C.L.1929, § 13414, is broadly auxiliary: "The consideration of any contract or agreement, required by the provisions of this chapter to be in writing, need not be set forth in the contract or agreement, or in the note or memorandum thereof, but may be proved by any other legal evidence."

The decree of the District Court is in all respects affirmed, the permanent injunction issued December 12, 1939, is sustained, and the cross-appeal is dismissed.